[Cite as *State v. Humphreys*, 2026-Ohio-373.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-9 |
| Appellee | : | |
| | : | Trial Court Case No. 24-CR-0650 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| ADAM HUMPHREYS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on February 6, 2026, the judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with the opinion.

Costs to be paid as follows: 50% by appellee and 50% by appellant.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

EPLEY, J., and HUFFMAN, J., concur.

JACOB S. SEIDL, Attorney for Appellant
ROBERT C. LOGSDON, Attorney for Appellee

HANSEMAN, J.

**{¶ 1}** Adam Humphreys appeals from his convictions in the Clark County Court of Common Pleas of attempted rape with a sexually violent predator specification, kidnapping with a sexual motivation specification and a sexually violent predator specification, and strangulation. In support of his appeal, Humphreys claims that he was denied his constitutional and statutory rights to a speedy trial. Humphreys also claims that the trial court erred during voir dire by failing to remove two biased jurors for cause and that his trial counsel was ineffective for failing to challenge the empanelment of those jurors. In addition, Humphreys claims that his convictions were not supported by sufficient evidence, were against the manifest weight of the evidence, and were based on inadmissible other-acts evidence in violation of Evid.R. 404(B). Humphreys also raises several claims challenging the validity of the sexual violent predator specifications that were attached to his attempted rape and kidnapping convictions. Humphreys further claims that the trial court erred at sentencing by failing to merge his convictions for attempted rape and kidnapping as allied offenses of similar import. Lastly, Humphreys claims that he was denied his right to a fair trial due to the cumulative effect of all the errors that were committed during his trial. For the reasons outlined below, Humphreys' convictions for strangulation and kidnapping with a sexual motivation specification and a sexually violent offender specification are affirmed, while his conviction for attempted rape with a sexually violent predator specification is reversed and remanded for a new trial.

**Facts and Course of Proceedings**

{¶ 2} On August 24, 2024, a Clark County grand jury returned a three-count indictment charging Humphreys with second-degree felony attempted rape in violation of R.C. 2907.02(A)(2), first-degree felony kidnapping in violation of R.C. 2905.01(A)(4) (sexual activity), and third-degree felony strangulation in violation of R.C. 2903.18(B)(2). The count for attempted rape included a sexually violent predator ("SVP") specification. The count for kidnapping included both a sexual motivation specification and an SVP specification. Humphreys had been originally indicted on June 25, 2024, in Clark County Case No. 2024 CR 484, but the State dismissed that case and reindicted Humphreys as stated above to add the aforementioned specifications to the charges.

{¶ 3} On September 3, 2024, Humphreys entered not guilty pleas to the charges and specifications in the indictment. Thereafter, Humphreys filed a notice electing to have the SVP specifications tried to the court as permitted by R.C. 2971.02. Four days before trial, Humphreys' trial counsel filed a motion to dismiss the case on speedy-trial grounds. The trial court did not rule on the motion. Humphreys' case proceeded to trial on December 9, 2024.

*The Victim's Testimony*

{¶ 4} At trial, the State presented the testimony of H.B., the victim of Humphreys' charged offenses. H.B. testified that on May 30, 2024, she was walking on a bicycle path in Springfield, Clark County, Ohio, when a male she did not know, later identified as Humphreys, approached her and said, "[H]ey, can I ask you a question. Can I take you on a date." Trial Tr. 161. H.B., who was a little surprised by the question, responded, "[N]o, I'm married. Have a nice day." *Id*. H.B. then continued to walk down the path and noticed that Humphreys continued to walk along the path as well.

3

{¶ 5} After a while, H.B. could tell that Humphreys was coming back in her direction and was following her on the bike path. She testified that she felt a little bit strange about the situation and eventually heard "his boots getting faster and faster up behind [her]." Trial Tr. 162. H.B. testified that she "had a really bad gut feeling about it . . . looked again and could tell that he stopped when he noticed [she looked]." *Id*. At that point, H.B. decided to turn around and face Humphreys. H.B. testified that before she could say anything, Humphreys said, "[C]an I at least offer you money." *Id*. H.B. testified that when Humphreys offered her money, she "knew what he meant by [his offer]"; she knew that "he wanted sex." Trial Tr. 162, 193. H.B. explained that Humphreys had been "looking at [her] in a way that made [her] really uncomfortable." Trial Tr. 162. Specifically, H.B. said that Humphreys looked at her "in a way that he wanted to do something that – [she] didn't want done to [her]." Trial Tr. 162-163. Following Humphreys' offer to pay her money, H.B. responded, "[N]o, I don't want to do that. Leave me alone." Trial Tr. 162, 193.

{¶ 6} H.B. recalled that Humphreys "charged at her" after she had told him to leave her alone. Trial Tr. 163. H.B. recounted that Humphreys "started running at [her], grabbed [her] shoulders and pushed [her] really hard on the ground on [her] back." *Id*. As a result, H.B. hit her head on the concrete. H.B. testified that Humphreys got on top of her and tried to "pin her down" as she screamed for him to get off. *Id*. H.B. detailed that she and Humphreys were no longer on the bike path because they had rolled down into the grass and tumbled into a wooded area.

{¶ 7} Continuing, H.B. testified that Humphreys had tried to grab her breasts, take off her pants, and rape her. She indicated that Humphreys' pelvis was on top of her legs and that he was trying to rub his body up against her as she tried to kick him off. H.B. confirmed

4

that she was able to prevent Humphreys from grabbing her breasts and taking off her pants and noted that only one of her shoes was removed during the incident.

{¶ 8} H.B. additionally said that Humphreys had punched and choked her. H.B. explained that Humphreys had choked her by grabbing her throat with his hand. H.B. testified that she had difficulty breathing as a result of Humphreys choking her and that she had visible marks on her neck the following day. H.B. recalled that her jaw, neck, and back hurt for days after the attack. H.B. identified photographs of her injuries that were taken by law enforcement the day after the attack. The photographs, which were admitted into evidence, show swelling to H.B.'s face and red marks on her neck, wrist, hand, elbows, and back. State's Exs. 2-11, 14-22. The photographs also show that H.B. had a severe abrasion on the inside of her mouth and a bruise on the top of her foot. State's Exs. 11-13.

{¶ 9} H.B. testified that she had been able to get away from Humphreys by using a "rape escape" technique that she had learned from a law enforcement officer. Trial Tr. 165, 197. H.B. explained that the technique involved maneuvering her legs in a way to get Humphreys off of her. After using the technique, H.B. got away from Humphreys, grabbed her phone and the shoe that had come off, ran away on the bike path, and called 9-1-1 for help. When H.B. escaped, Humphreys fled the scene.

{¶ 10} After H.B. called 9-1-1, law enforcement officers responded to the scene, and H.B. reported the incident. One of the officers collected fingernail scrapings from H.B. and sent the scrapings to the Ohio Bureau of Criminal Investigation for DNA analysis. The DNA analysis established that H.B.'s fingernail scrapings tested positive for Humphreys' DNA. After learning that Humphreys' DNA was on H.B.'s fingernail scrapings, the lead detective, Sandy Fent, put together a photographic lineup of suspects that included Humphreys'

5

photograph. When presented with the lineup, H.B. positively identified Humphreys as her attacker.

*Prior Juvenile Adjudication*

{¶ 11} Prior to trial, the State filed a notice in accordance with Evid.R. 404(B) indicating that it intended to introduce other-acts evidence establishing that Humphreys had been adjudicated a juvenile delinquent in 2022 for attempted rape. The State indicated that the juvenile adjudication would be used for the purpose of establishing Humphreys' motive for attacking H.B. After hearing the victim's testimony and the parties' arguments on the matter, the trial court found that the juvenile adjudication could be properly admitted for the limited purpose of establishing Humphreys' motive and thus allowed the State to present the juvenile adjudication to the jury over Humphreys' objection.

{¶ 12} The State presented the juvenile adjudication through the testimony of Detective Fent. In doing so, the State had Fent identify a Shelby County Juvenile Court document captioned: "In the Matter of: Adam M Humphreys Adjudged Delinquent Child." State's Ex. 38. The document is titled "Judgment Entry Orders on Pre-Trial Conference." *Id*. Under the heading "ORDERS," the document states: "The Court accepts the child's admission to the amended charge of attempted rape F2 in Case No. 2021 FEL 0012 and adjudicates him a delinquent child." *Id*. The document is dated February 23, 2022.

{¶ 13} After the State presented Fent with the document, Fent testified that the document contained Humphreys' 2022 juvenile adjudication for attempted rape. Fent indicated that she had obtained the document in the course of her investigation. No other information was elicited about the juvenile adjudication at trial.

{¶ 14} Shortly after Fent testified about Humphreys' juvenile adjudication, the trial court told the jury that it could consider the juvenile adjudication only as evidence of

6

Humphreys' motive for attacking H.B. and that it may not consider the record as evidence of his character. The trial court gave the same limiting instruction to the jury at the close of trial.

*Verdict, Specifications Hearing, and Sentencing*

{¶ 15} After the parties rested their cases, the jury deliberated and found Humphreys guilty of all three offenses charged in the indictment. The trial court then held a hearing on the SVP specifications. To establish the SVP specifications, the State presented additional testimony from Detective Fent. In particular, Fent testified regarding Humphreys' prior juvenile adjudication for attempted rape and how she had obtained that information through eSORN, Ohio's electronic sex-offender registration and notification database. Following the hearing, the trial court found Humphreys guilty of the SVP specifications.

{¶ 16} At Humphreys' sentencing hearing, the State advised the trial court that no finding had been made on the sexual motivation specification attached to Humphreys' kidnapping offense. The trial court thereafter found that the sexual motivation specification had been established by virtue of Humphreys being found guilty of sexual-activity kidnapping in violation of R.C. 2905.01(A)(4).

{¶ 17} Because the trial court found Humphreys guilty of the SVP specifications, it sentenced Humphreys under the enhanced sentencing scheme in R.C. 2971.03. For attempted rape, the trial court imposed an indefinite term of eight years to life in prison. For kidnapping, the trial court imposed an indefinite term of eleven years to life in prison. For strangulation, the trial court imposed a definite term of three years in prison. The trial court ordered all Humphreys' sentences to be served consecutively for an aggregate term of 22 years to life in prison.

{¶ 18} Humphreys now appeals from his convictions, raising seven assignments of error for review. For clarity, we address Humphreys' assignments of error out of order.

7

**Third Assignment of Error**

{¶ 19} Under his third assignment of error, Humphreys contends that his statutory and constitutional rights to a speedy trial were violated and that the trial court erred by failing to dismiss his case on those grounds. We disagree.

*Standard of Review*

{¶ 20} "Review of a speedy-trial claim involves a mixed question of law and fact. Therefore, we defer to the trial court's factual findings if they are supported by competent, credible evidence, but we review the application of the law to those facts de novo." (Citation omitted.) *State v. Long*, 2020-Ohio-5363, ¶ 15; *accord State v. Knott*, 2024-Ohio-2289, ¶ 15 (2d Dist.). "De novo review requires an 'independent review of the trial court's decision without any deference to the trial court's determination.'" *State v. Clay*, 2016-Ohio-424, ¶ 5 (2d Dist.), quoting *Jackson v. Internatl. Fiber*, 2006-Ohio-5799, ¶ 17 (2d Dist.).

*Statutory and Constitutional Speedy-Trial Rights*

{¶ 21} "'The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to a speedy trial by the state. . . . This same right is assured an accused party by Section 10, Article 1 of the Ohio Constitution.'" (Footnote omitted.) *State v. O'Brien*, 34 Ohio St.3d 7, 8 (1987), quoting *State v. Ladd*, 56 Ohio St.2d 197, 200 (1978). The constitutional right to a speedy trial is also statutorily enforced in Ohio by the provisions of R.C. 2945.71 et seq. *State v. Adams*, 43 Ohio St.3d 67, 68 (1989). "Thus, for purposes of bringing an accused to trial, the statutory speedy trial provisions of R.C. 2945.71 et seq. and the constitutional guarantees found in the United States and Ohio Constitutions are coextensive." (Emphasis deleted.) *O'Brien* at 9.

{¶ 22} "[A]lthough the statutory and constitutional speedy trial provisions are coextensive, the constitutional guarantees may be found to be broader than speedy trial

8

statutes in some circumstances." *Id*. The Supreme Court of Ohio has recognized that "'there may be situations wherein the statutes do not adequately afford the protection guaranteed by the federal and state constitutions, in which case it is our duty to see that an accused receives the protection of the higher authority.'" *Id*., quoting *Ladd* at 201. "'[B]ecause constitutional speedy trial guarantees may be found to be broader than speedy trial statutes,' a constitutional right to a speedy trial must be analyzed separately from a statutory speedy trial right." *State v. Frazier*, 2023-Ohio-4222, ¶ 6 (9th Dist.), quoting *State v. Williams*, 1994 WL 135309, *2 (9th Dist. Apr. 20, 1994).

*Relevant Statutory Speedy-Trial Law*

**{¶ 23}** Under Ohio's statutory scheme, the time limit for bringing an accused to trial on a felony offense is 90 days after arrest if the accused is incarcerated the entire time preceding his trial. *State v. Dankworth*, 2007-Ohio-2588, ¶ 31 (2d Dist.); R.C. 2945.71(C) and (E). "A defendant establishes a prima facie speedy trial violation when his motion [to dismiss] reveals that a trial did not occur within the time period prescribed by R.C. 2945.71." *State v. Hill*, 2020-Ohio-2958, ¶ 6 (2d Dist.), citing *State v. Butcher*, 27 Ohio St.3d 28, 31 (1986). However, that time period can be extended or tolled by any of the several events listed under R.C. 2945.72(A) through (J).

**{¶ 24}** Pursuant to R.C. 2945.72(E), speedy-trial time is tolled for "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." To qualify as a tolling event under R.C. 2945.72(E), "all that the statute requires is that the delay be necessitated by the defendant's action." *State v. Belville*, 2022-Ohio-3879, ¶ 31. Therefore, "[a]ny period of delay necessitated by a defendant's own motion automatically acts as a tolling event." *State v. Whitfield*, 2023-Ohio-240, ¶ 29 (2d Dist.), citing *Belville* at ¶ 31. For example, "[a] defendant's demand for

discovery or a bill of particulars . . . constitutes a tolling event under R.C. 2945.72(E). (Citations omitted.) *Knott*, 2024-Ohio-2289, at ¶ 22 (2d Dist.). "Such demands toll speedy-trial time for a reasonable period to allow the state an opportunity to respond." (Citations omitted.) *Id*. "'Courts have generally interpreted 30 days to constitute a reasonable period to respond to requests for discovery or a bill of particulars.'" *Id*., quoting *State v. Smith*, 2017-Ohio-7864 ¶ 23 (4th Dist.), citing *State v. Shabazz*, 2011-Ohio-2260, ¶ 26 (8th Dist.), and *State v. Ford*, 2009-Ohio-146, ¶ 8-11 (1st Dist.). "However, the Supreme Court of Ohio has explained that '[w]hat is reasonable will necessarily be a case-by-case determination and depend on the totality of the circumstances.'" (Bracketed text in original.) *Id*., quoting *Belville* at ¶ 21.

**{¶ 25}** Speedy-trial time is also tolled for "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H). Therefore, "[c]ontinuances that a defendant requests toll the clock under R.C. 2945.75(H)." *State v. Lewis*, 2021-Ohio-1895, ¶ 35 (2d Dist.). "'[W]here a continuance is not based on the defendant's request, it will extend the speedy trial time only if the continuance is reasonable and necessary under the circumstances of the case.'" *Knott* at ¶ 23, quoting *State v. Willis*, 2016-Ohio-616, ¶ 17 (6th Dist.), citing *State v. Saffell*, 35 Ohio St.3d 90, 91 (1988). "In other words, continuances that are granted at the State's request or that are ordered sua sponte by the trial court must be reasonable to toll speedy-trial time." (Citations omitted.) *Id*.

**{¶ 26}** If sua sponte or State-requested continuances "'are not reasonable, both types of continuances must be charged against the state for speedy-trial purposes.'" *Knott* at ¶ 23, quoting *State v. Stamps*, 127 Ohio App.3d 219, 224 (1st Dist. 1998). "Therefore, for the continuance to toll speedy trial time, '[t]he record must reflect that the continuance was

10

"reasonable in both purpose and length."'" (Bracketed text in original.) *Id*. at ¶ 24, quoting *State v. Martin*, 56 Ohio St.2d 289, 293 (1978), quoting *State v. Lee,* 48 Ohio St.2d 208, 210 (1976). "The reasonableness of a continuance must be reviewed on a case-by-case basis and is strictly construed against the State." (Citations omitted.) *Id.* "Ideally, '[w]hen sua sponte granting a continuance under R.C. 2945.72(H), the trial court must enter the order of continuance and the reasons therefor by journal entry prior to the expiration of the time limit prescribed in R.C. 2945.71 for bringing a defendant to trial.'" (Bracketed text in original.) *State v. Ramey*, 2012-Ohio-2904, ¶ 32, quoting *State v. Mincy*, 2 Ohio St.3d 6 (1982), syllabus.

*Statutory Speedy-Trial Analysis*

{¶ 27} In this case, Humphreys' speedy-trial time began running the day after he was arrested, June 18, 2024. There is no dispute that Humphreys was incarcerated during the entire pendency of his case and that the State had 90 days to bring him to trial. There is also no dispute that Humphreys was incarcerated for a total of 174 days, i.e., between June 18, 2024, and December 9, 2024. The record, however, establishes that several tolling events occurred under R.C. 2945.72.

{¶ 28} On September 3, 2024, 78 days after Humphreys' arrest, Humphreys filed a demand for discovery and a demand for a bill of particulars. In accordance with R.C. 2945.72(E), Humphreys' speedy-trial time was tolled when he filed those demands. The State asserts and we agree that 30 days was a reasonable amount of time for the State to respond to the demands; accordingly, the demands tolled Humphreys' speedy-trial time until October 3, 2024.

{¶ 29} Before the 30-day tolling period ended, on September 18, 2024, the trial court issued an entry stating that Humphreys' trial had been continued from September 10, 2024,

11

to October 8, 2024. Although the corresponding entry indicated that the trial court continued the trial on its own motion, it also indicated that the continuance was ordered "because defense counsel [was] . . . in a jury trial before Judge Driscoll in . . . Case No. 22-CR-0518." The entry did not specifically state that defense counsel requested a continuance, but because the record indicates that the continuance was necessitated by defense counsel's unavailability, it was properly charged to the defense. Therefore, speedy-trial time was tolled regardless of whether the continuance was reasonable in purpose and length. Even if we were to charge the continuance to the trial court, the resulting 28-day continuance was reasonable in purpose and length. Accordingly, Humphreys' speedy-trial time was tolled through October 8, 2024.

{¶ 30} On October 16, 2024, the trial court issued another entry on its own motion that continued trial from October 8, 2024, to December 9, 2024. The entry stated that "[t]he October 8, 2024 jury trial is continued because [the court] is presiding over a drug-trafficking jury trial in . . . Case Number 21-CR-0408(A)."

{¶ 31} "It is well established that scheduling and docketing conflicts are reasonable grounds for extending an accused's trial date beyond the speedy-trial time limit." (Citations omitted.) *State v. Sweeney*, 2024-Ohio-3425, ¶ 30 (2d Dist.), *vacated on other grounds*, 2026-Ohio-57 (2d Dist.). "Therefore 'a continuance issued by the trial court due to involvement in another criminal trial tolls the running of the speedy trial time.'" *Id*., quoting *State v. Christian*, 2014-Ohio-2590, ¶ 19 (7th Dist.), citing *State v. McCall*, 2003-Ohio-1603, ¶ 23 (7th Dist.).

{¶ 32} In *Sweeney*, we found that a two-and-a-half month sua sponte trial continuance was reasonable in both purpose and length where it was ordered because the

12

trial court was presiding over a trial in another criminal case. In reaching that decision, we explained:

> [I]t is clear that when rescheduling trial dates, a trial court is not only constrained by its own docket and schedule, but also by the schedules of the prosecutor and defense counsel who are trying the case. Other courts have found trial continuances of similar lengths to be reasonable. *See, e.g., State v. Cottrell*, 2012-Ohio-4583, ¶ 17 (4th Dist.) ("given the time constraints and complexity of a trial court's docket, 58 days is a reasonable length of time to continue a jury trial"); *State v. Smith*, 2011-Ohio-602, ¶ 26-33 (4th Dist.) (holding that 45-day and 78-day continuances were reasonable); *State v. Hughes*, 2010-Ohio-2969, ¶ 9 (4th Dist.) ("[w]e are cognizant of the burdensome caseloads in Ohio trial courts and do not believe that a two month continuance is necessarily unreasonable"); *State v. Judd*, 1996 WL 532180, *4 (10th Dist. Sept. 19, 1996) (75-day sua sponte trial continuance "was for good cause and was both necessary and reasonable, given that the trial court entered upon the record that it was engaged in another criminal trial").
>
> "'[I]t is difficult, if not unwise, to establish a per se rule of what constitutes "reasonableness"' when determining the length of a continuance for speedy trial purposes." [*State v. Monroe*, 2007-Ohio-1492, ¶ 34 (4th Dist.), quoting *State v. Saffell*, 35 Ohio St.3d 90, 91 (1988).] Here, we do not find that two and a half months was an unreasonably long continuance for Sweeney's jury trial.

*Sweeney* at ¶ 31-32.

13

**{¶ 33}** For the same reasons discussed in *Sweeney*, we find that the two-month trial continuance in the present case was not unreasonably long; it was reasonable in both purpose and length. Accordingly, under R.C. 2945.72(H), speedy trial time was tolled between October 8, 2024, and December 9, 2024. Humphreys was then brought to trial on December 9, 2024.

**{¶ 34}** Given all the aforementioned tolling events, only 78 days of speedy-trial time elapsed between Humphreys' arrest and his December 9, 2024 trial. We note that although the trial court filed its continuance entries a few days after the scheduled trial dates, the lag time was nevertheless part of the tolling period as the entries were filed within the statutory speedy-trial time limit. *See State v. Littlefield*, 2002-Ohio-3399, ¶ 11 (3d Dist.). Because Humphreys was tried within the 90-day statutory time limit, there was no statutory speedy-trial violation. The analysis supporting that conclusion is summarized in the table shown below.

| Date | Event | Speedy-Trial Days Counted |
|---|---|---|
| June 17, 2024 | Humphreys was arrested. | 0 days |
| Sept. 3, 2024 | Humphreys served demands for discovery and bill of particulars on the State.<br><br>*Speedy-trial time tolled pursuant to R.C. 2945.72(E) (30-day tolling period)* | 78 days<br><br>(June 18 to Sept. 3) |
| Sept. 10, 2024 (By Sept. 18 Entry) | The trial court continued Humphreys' jury trial from September 10, 2024, to October 8, | 0 days |

14

| | | |
|---|---|---|
| | 2024, due to scheduling conflict of defense counsel.<br><br>*Secondary tolling event; speedy trial time tolled pursuant to R.C. 2945.72(H)* | |
| Oct. 8, 2024<br>(By Oct. 16 Entry) | The trial court continued Humphreys' jury trial from October 8, 2024, to December 9, 2024, due to the trial court presiding over a drug-trafficking jury trial on October 8th.<br><br>*Tolling event; speedy trial time tolled pursuant to R.C. 2945.72(H)* | 0 days |
| Nov. 22, 2024 | The State submitted its discovery responses and bill of particulars.<br><br>*Speedy-trial time still tolled under R.C. 2945.72(H) due to trial continuance* | 0 days |
| Dec. 5, 2024 | Humphreys filed a motion to dismiss on speedy-trial grounds. The trial court did not rule on the motion. | 0 days |
| Dec. 9, 2024 | Humphreys' trial commenced. | 0 days |
| June 18, 2024, to Dec. 9, 2024 | TOTAL SPEEDY-TRIAL DAYS | 78 days |

{¶ 35} We note that even if Humphreys had not been brought to trial within the statutory time requirement, under R.C. 2945.73(C)(1), he would have been only "eligible for

15

release from detention." This is different from the former version of R.C. 2945.73, which had required a trial court to discharge an accused from criminal liability if the accused had not been brought to trial within the statutory time limit. *Knott*, 2024-Ohio-2289 at ¶ 47 (2d Dist.), citing former R.C. 2945.73(B). Under the current version of R.C. 2945.73, which dictates the analysis of this case, if the expiration of speedy-trial time is timely raised by motion, as it was here, a defendant must be tried within 14 days after the motion is filed and served on the prosecutor. R.C. 2945.73(C)(2). Only if a defendant's case is not tried within that 14-day grace period are the defendant's criminal charges to be dismissed with prejudice. *Id*. Here, Humphreys concedes that he was tried within 14 days of filing his motion to dismiss on speedy-trial grounds. Therefore, even if there had been a statutory speedy-trial violation, there was no grounds for a dismissal of the charges given that Humphreys was tried within the 14-day grace period set forth in R.C. 2945.73(C).

*Relevant Constitutional Speedy-Trial Law*

**{¶ 36}** Courts apply a four-factor balancing test when determining whether there is a constitutional speedy-trial violation. *Barker v. Wingo*, 407 U.S. 514, 530-533 (1972). "'The factors include: (1) the length of the delay "between accusation and trial"; (2) the reason for the delay; (3) the defendant's assertion, if any, of his right to a speedy trial; and (4) the prejudice, if any, to the defendant.'" *State v. Hart*, 2022-Ohio-4550, ¶ 90 (2d Dist.), quoting *State v. Wagner*, 2021-Ohio-1671, ¶ 14 (2d Dist.), quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992).

**{¶ 37}** "[T]he length of the delay is a particularly important factor as it 'is to some extent a triggering mechanism.'" *State v. Lee*, 2024-Ohio-1802, ¶ 9 (2d Dist.), quoting *Barker* at 530. This is because, "'[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Id*., quoting *Barker*

16

at 530. "The length of delay becomes presumptively prejudicial as it approaches one year in length." *Id*., citing *Doggett* at 652, fn. 1; *State v. Adams*, 2015-Ohio-3954, ¶ 90.

*Constitutional Speedy-Trial Analysis*

{¶ 38} In this case, Humphreys was brought to trial within 174 days—just under six months after his arrest. The Supreme Court of Ohio has held that a similar-length delay of 149 days was not presumptively prejudicial and was constitutionally reasonable in a case where the defendant was charged with driving under the influence of alcohol. *State v. Hull*, 2006-Ohio-4252, ¶ 25. In a case where the defendant had been charged with several counts of rape and sexual battery, the Eighth District Court of Appeals held that a sixth-month delay was not presumptively prejudicial. *State v. Duncan*, 2012-Ohio-3683, ¶ 9 (8th Dist.). This court held that the delay in trying a defendant, who was charged with several offenses, including rape, was not presumptively prejudicial where the defendant was brought to trial eight months after his arrest and less than six months after he withdrew his speedy-trial waiver. *State v. Boles*, 2003-Ohio-2693, ¶ 27 (2d Dist.). *See also State v. Williams*, 2014-Ohio-2737, ¶ 39 (10th Dist.) (five-month delay insufficient "to meet the threshold inquiry to trigger the full *Barker* analysis" in case where defendant was charged with escape and multiple counts of robbery).

{¶ 39} Upon review, we find that the 174-day delay in bringing Humphreys to trial was not presumptively prejudicial. Because the delay was not presumptively prejudicial, we need not address the other *Barker* factors, as the delay was constitutionally reasonable. Accordingly, Humphreys constitutional speedy-trial claim lacks merit.

*Ineffective Assistance of Counsel*

{¶ 40} Humphreys tangentially argues that his trial counsel provided ineffective assistance by failing to file his speedy-trial motion to dismiss "immediately upon expiration

17

of the statutory time." To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) trial counsel's conduct was deficient and (2) trial counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lloyd*, 2022-Ohio-4259, ¶ 15. "[I]n order to demonstrate that counsel provided ineffective assistance of counsel by failing to file a motion to dismiss for speedy trial violations, the defendant must show that the motion would have been successful and the case would likely have been dismissed." *State v. Mango*, 2016-Ohio-2935, ¶ 18 (8th Dist.), citing *Cleveland v. White*, 2013-Ohio-5423, ¶ 7 (8th Dist.).

{¶ 41} In this case, Humphreys' ineffective-assistance claim lacks merit because there was no speedy-trial violation. Therefore, his motion to dismiss would have been unsuccessful regardless of when it was filed. Because of this, Humphreys cannot establish any prejudice arising from the timing of the motion. For this reason, Humphreys' ineffective-assistance claim fails.

{¶ 42} Humphreys' third assignment of error is overruled.

### Sixth Assignment of Error

{¶ 43} Under his sixth assignment of error, Humphreys claims that the trial court violated his Sixth Amendment right to a fair trial and impartial jury by failing to remove certain jurors for cause, based on bias. Humphreys also claims that his trial counsel provided ineffective assistance by failing to challenge the empanelment of the allegedly biased jurors. We disagree with Humphreys' claims.

{¶ 44} The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant "'the right to an impartial and unbiased jury.'" *State v. Froman*, 2020-Ohio-4523, ¶ 49, quoting *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004). "Voir dire serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an

18

impartial jury." *Id.*, quoting *Miller* at 672. "[W]hen a juror who has exhibited actual bias against a defendant is seated on the jury, the defendant's Sixth Amendment right to an impartial jury has been violated." *Id.*

{¶ 45} "In reviewing claims of actual bias that are based on the jury-selection process, we consider the totality of the evidence, considering whether the voir dire transcript as a whole demonstrates that the juror was actually biased." *State v. Rogers*, 2025-Ohio-4794, ¶ 41, citing *Holder v. Palmer*, 588 F.3d 328, 340 (6th Cir. 2009). "Actual bias means '"bias in fact"—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" *Id.* at ¶ 30, quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997), citing *United States v. Wood*, 299 U.S. 123, 133 (1936). "It can be shown by a juror's admission or circumstantial evidence of the juror's biased attitude." *State v. Joseph*, 2025-Ohio-1204, ¶ 19, citing *Froman* at ¶ 50, citing *Hughes v. United States*, 258 F.3d 453, 459 (6th Cir. 2001). "An impression or opinion does not make a juror partial unless that juror cannot '"lay aside [the] impression or opinion and render a verdict based on the evidence presented in court."'" (Bracketed text in original) *Rogers* at ¶ 30, quoting *State v. Warner*, 55 Ohio St.3d 31, 47 (1990), quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

{¶ 46} The determination of whether a prospective juror should be disqualified for cause as result of impartiality or bias is a discretionary function of the trial court and will not be reversed on appeal absent an abuse of discretion. *Froman* at ¶ 49; *State v. Smith*, 80 Ohio St.3d 89, 105 (1997). The record indicates that Humphreys did not object to the empanelment of the alleged biased jurors; accordingly, he has waived all but plain error for appeal. *Smith* at 105. "To establish plain error, [an appellant] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis

19

deleted.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

{¶ 47} In this case, Humphreys claims that the trial court should have disqualified Juror #10 for cause on grounds of bias. The record establishes that Juror #10 indicated that she had been the victim of a sexual offense 10 to 12 years earlier when she was in college. Trial Tr. 44, 46-47. The State asked Juror #10 if she would be able to put aside what had happened to her when looking at the facts of the case, and Juror #10 answered, "I believe, yes." Trial Tr. 47. After asking a few follow-up questions, the State also asked, "[D]o you believe you'll be able to be fair and impartial?" Juror #10 responded, "Yes." Trial Tr. 48.

{¶ 48} In arguing that Juror #10 was biased, Humphreys points to a subsequent statement in which Juror #10 indicated that it would be difficult for her to separate her experiences from the facts of the case. Specifically, Juror #10 stated the following:

I think it would be difficult, yes. But I like to not think about myself while I'm on something like this. Like, I know that our experiences make up something but following what I notice on what facts are given and things like that. But yes, it would be difficult to separate. But I think it's difficult for people to separate feelings and even just experiences in general.

Trial Tr. 69-70.

{¶ 49} Upon review, we do not find that Juror #10's statements evidenced actual bias, as Juror #10 confirmed that she would be able to remain impartial despite her past experience. Although Juror #10 indicated that it would be difficult to separate her past experience from the facts of the case, based on her statements, there is no reason to believe that she would not act with entire impartiality. Regardless, "[a] juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias. The

20

Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality." *Miller*, 385 F.3d at 674 (6th Cir. 2004); *accord Joseph* 2025-Ohio-1204 at ¶ 25 (2d Dist.). We also note that there is no "per se rule excluding victims of sexual assault from serving as jurors in cases involving sexual assault." *State v. T.L.*, 2020-Ohio-3430, ¶ 25 (10th Dist.). Accordingly, the record indicates that Humphreys has failed to establish any error, let alone plain error with regard to the empanelment of Juror #10.

{¶ 50} Humphreys also takes issue with the trial court's failure to remove Juror #6, who indicated that he had multiple close friends who had been raped and one close friend who had been kidnapped. Juror #6, however, affirmatively stated that he did not believe that those circumstances would affect his ability to be impartial. He also affirmatively indicated that he would be able to separate what had happened to his friends from the evidence that was going to be presented at trial. Thus, we find no evidence of actual bias and again find that Humphreys has failed to establish any error, let alone plain error.

{¶ 51} Humphreys also claims that his trial counsel was ineffective for failing to challenge the jurors in question. As previously noted, to prevail on a claim of ineffective assistance of counsel, a defendant must establish both that his counsel's performance was deficient and that he was prejudiced by that deficient performance. *Strickland*, 466 U.S. at 687; *Lloyd*, 2022-Ohio-4259, at ¶ 15. Where claim of ineffective assistance of counsel is founded upon counsel's failure to remove a biased juror, the defendant must show that the juror was actually biased against him. *Rogers,* 2025-Ohio-4794, at ¶ 38-39, 62; *Froman*, 2020-Ohio-4523, at ¶ 52. Because Humphreys failed to show that Juror #10 and Juror #6 were biased against him, his ineffective assistance claim necessarily fails.

{¶ 52} Humphreys' sixth assignment of error is overruled.

**Second Assignment of Error**

{¶ 53} Under his second assignment of error, Humphreys claims that his convictions for attempted rape, kidnapping, and strangulation were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

*Standards of Review*

{¶ 54} "When a defendant challenges the sufficiency of the evidence, [he] is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law." *State v. Matthews*, 2018-Ohio-2424, ¶ 7 (2d Dist.), citing *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id*., quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jenks* at 273.

{¶ 55} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagle*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness

22

credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*Attempted Rape*

**{¶ 56}** As previously discussed, the jury found Humphreys guilty of attempted rape in violation of R.C. 2907.02(A)(2) and 2923.02. The rape statute provides, in pertinent part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). The term "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

**{¶ 57}** "'Attempt' is defined as purposely or knowingly engaging in conduct that, if successful, would constitute or result in the offense." *State v. Howard*, 2015-Ohio-3917, ¶ 41 (2d Dist.), citing R.C. 2923.02. "'In order to prove an attempt to commit an offense, it must be shown that particular conduct directed toward commission of the offense took place and that such conduct, if successful, would constitute or result in the offense.'" *State v. Brooks*, 44 Ohio St.3d 185, 190 (1989), quoting *State v. Woods*, 48 Ohio St.2d 127, 131 (1976), *vacated on other grounds by State v. Downs*, 51 Ohio St.2d 47 (1977); accord *State v. Kirkland*, 2014-Ohio-1966, ¶ 135. That is, it must be shown that the offender not only intended to commit the offense, "but also engaged in conduct constituting a substantial step

toward completing the offense." *Kirkland* at ¶ 135. "'To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose.'" *Id*. quoting *Woods* at paragraph one of the syllabus.

{¶ 58} "Attempted rape requires that the actor (1) intend to compel submission to sexual conduct by force or threat, and (2) commit some act that "'convincingly demonstrate[s]'" such intent." *State v. Davis*, 76 Ohio St.3d 107, 114 (1996), quoting *State v. Heinish*, 50 Ohio St.3d 231, 238-239 (1990), quoting *Woods* at 132. "[R]emoving the victim's clothing can amount to a 'substantial step' toward the commission of rape," but "a defendant cannot be convicted of attempted rape *solely* on evidence that he removed the victim's clothing." (Emphasis in original.) *Id*. at 114. "There must be evidence indicating purpose to commit rape instead of some other sex offense, such as gross sexual imposition, R.C. 2907.05, which requires only sexual *contact*." (Emphasis in original.) *Id*. at 114, citing *Heinish* at 238-239. Unlike sexual conduct, "'[s]exual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 59} In *Heinish*, the Supreme Court of Ohio found insufficient evidence of attempted rape where the evidence established that the deceased victim was found wearing no underwear with her jeans partially unzipped and pulled down from her hips and her blouse partially pulled up toward her chest. *Heinish* at 232, 238-239. The evidence also established that there was a saliva stain near the crotch of the victim's jeans that laboratory analysis revealed could have come from the defendant. *Id*. at 232. However, the laboratory analysis also indicated that 32 percent of the Caucasian population could have deposited saliva stain. *Id*. The Supreme Court found that there was "no evidence by itself sufficient to reach the

threshold of a separate crime of attempted rape as opposed to gross sexual imposition. Evidence of finding the victim's body in the condition noted above does not allow the fact-finder to conclude beyond a reasonable doubt that an attempted rape has occurred." *Id*. at 239.

{¶ 60} In contrast, the Supreme Court of Ohio found sufficient evidence of attempted rape where the evidence established that the defendant had ordered the victim to undress and that the defendant had admitted to the police that he was going to have sex with the victim. *State v. Powell*, 49 Ohio St.3d 255, 261 (1990).

{¶ 61} The Fifth District Court of Appeals found sufficient evidence of attempted rape where the evidence established that the defendant had dragged the victim out of a motel bar, ripped off the victim's shirt and bra, told her "the pants are coming off," grabbed the victim's breasts and crotch, and was found with his pants around his ankles wearing no underwear while on top of the victim. *State v. Lucas*, 2006-Ohio-1675, ¶ 23-27 (5th Dist.). There was also testimony indicating that just prior to the incident, the defendant told an employee of the motel that he "wouldn't mind taking her [the victim] home." (Bracketed text in original.) *Id*. at ¶ 25. On appeal, the defendant argued that there was no verbalization of his intentions and that his acts were insufficient to prove that he had intended to rape the victim as opposed to some other sexual contact. *Id*. at ¶ 22. The Fifth District disagreed and found that the defendant's "act of lying on the victim with his genitals exposed to her vaginal area while attempting to pull off her pants was a 'substantial step' to rape" and that it would be "disingenuous to declare that conduct other than sexual conduct was about to occur if the victim had been subdued." *Id*. at ¶ 27.

{¶ 62} The Eighth District Court of Appeals vacated a defendant's conviction for attempted rape where the evidence established that the defendant had ordered the victim

to remove her clothes at knifepoint. *State v. Jones*, 2004-Ohio-512, ¶ 3-5, 24-26 (8th Dist.). The victim called 9-1-1, and the defendant fled. *Id.* at ¶ 5. The court held that the record contained no evidence that the defendant attempted to engage in sexual conduct with the victim or that he expressed an intent to do so. *Id.* at ¶ 24. The court stated that "[t]here were no 'sexual advances' toward [the victim] and no evidence that [the defendant] performed any 'overt act,' such as unzipping his pants or removing his clothes, that would indicate his intent to rape her." *Id.*

{¶ 63} In contrast, the Eight District found sufficient evidence of attempted rape where a witness observed the defendant standing over the victim with his pants down, attempting to remove the victim's pants. *State v. Brown*, 2013-Ohio-1982, ¶ 21 (8th Dist.). Although the witness could not state whether the defendant was wearing underwear at the time, the court found that "the fact that [defendant] removed his own pants is indicative of his intent to engage in sexual conduct with the victim and is inconsistent with an intent to engage in mere sexual contact." *Id.* Furthermore, after the witness discovered the defendant and the defendant fled, the victim was discovered unclothed from the waist down. *Id.* Under these circumstances, the Eighth District found "that the state presented evidence indicating purpose to commit rape instead of some other sex offense." *Id.*

{¶ 64} In this case, the evidence established that Humphreys had asked H.B. on a date prior to attacking her. The evidence also established that when H.B. said, "[N]o, I'm married," Humphreys approached H.B. a few moments later and said, "[C]an I at least offer you money?" Trial Tr. 161-162. H.B.'s testimony indicated that although Humphreys did not explicitly ask to pay her for sex, she knew by the way Humphreys was looking at her that he wanted sex when he offered her money.

26

{¶ 65} The evidence also established that Humphreys charged at H.B., grabbed her shoulders, and pushed her down to the ground on her back immediately after she had rejected his offer for money. H.B. testified that Humphreys got on top of her and tried to pin her down. She noted that Humphreys punched her, strangled her, and tried to grab her and rape her. Specifically, H.B. testified that Humphreys' pelvis was on top of her legs and that Humphreys tried to rub his body up against her. H.B. also testified that Humphreys had tried to grab her breasts and take off her pants. H.B. explained that she had prevented Humphreys from grabbing her breasts and taking off her pants by kicking him off her. H.B. said that the only item of clothing removed during the incident was one of her shoes. There was no testimony as to whether any of Humphreys' clothing was removed during the incident. H.B. testified that she used a technique called "the rape escape" to free herself from Humphreys. Trial Tr. 165, 197.

{¶ 66} In addition to H.B.'s testimony, the State presented evidence establishing that Humphreys had a prior juvenile adjudication for attempted rape from 2022. As previously discussed, the trial court instructed the jury that it could consider the juvenile adjudication only as evidence of Humphreys' motive for attacking H.B.

{¶ 67} During trial, Humphreys did not dispute the fact that he was H.B.'s attacker. The only issue at trial was whether there was sufficient evidence indicating that Humphreys had attacked H.B. with the intent of compelling her to engage in forced sexual conduct with him. Without that intent, Humphreys' offense would have amounted to an assault, not attempted rape.

{¶ 68} We find that Humphreys' conduct of positioning his pelvis on top of H.B.'s legs and attempting to take off her pants and rub his body up against her are overt acts that arguably suggest that he intended to engage in sexual conduct with H.B. Although it is also

27

arguable that such acts are indicative of an intent to engage in sexual *contact*, we find that H.B.'s testimony that Humphreys had indirectly asked to have sex with her by offering her money just before the attack, *and* that, for its limited purpose, the record of Humphreys' prior juvenile adjudication for attempted rape would have allowed a rational jury to conclude that Humphreys had intended to rape H.B., i.e., compel her to submit to forced sexual conduct as opposed to sexual contact. In other words, we find that when viewing the evidence in a light most favorable to the State, the jury could have reasonably concluded from all the evidence that Humphreys had propositioned H.B. for sex and then subsequently engaged in the aforementioned overt acts in an attempt to have forced sex with H.B. after she declined his proposition. *See Kirkland*, 2014-Ohio-1966, at ¶ 137 (finding the fact that the defendant attacked the victim only after the victim refused his sexual advances "created a strong inference that he acted with a sexual purpose—that being, to forcibly compel from her what she had refused to give him").

{¶ 69} Although we recognize that whether the evidence sufficiently established that Humphreys intended to engage in forced sexual conduct with H.B., as opposed to sexual contact, is a close call, we stress that we are required to review the evidence in a light most favorable to the State. When doing so, we believe that based on all the evidence, a rational juror could have concluded beyond a reasonable doubt that Humphreys intended to rape H.B., i.e., engage in forced sexual conduct with her. Because the State presented evidence establishing that Humphreys intended to compel H.B. to engage in forced sexual conduct and that he engaged in overt acts demonstrating that intent, we find that there was sufficient evidence for a rational jury to find that the essential elements of attempted rape were proven beyond a reasonable doubt.

28

**{¶ 70}** Also, after reviewing the entire record and weighing all the evidence and reasonable inferences, we find that the jury did not lose its way or create a manifest miscarriage of justice by finding Humphreys guilty of attempted rape. The jury was free to credit H.B.'s testimony indicating that Humphreys wanted to have sex with her and was permitted to consider Humphreys' prior juvenile adjudication for attempted rape as evidence of his motive behind the attack. The weight of that evidence, combined with H.B.'s testimony that Humphreys positioned his pelvis on top of her and tried to take off her pants and rub his body up against her, supports the jury's determination that Humphreys intended to rape H.B. and engaged in overt acts demonstrating that intent. Accordingly, Humphreys' conviction for attempted rape was not against the manifest weight of the evidence.

*Kidnapping*

**{¶ 71}** Humphreys was also convicted of kidnapping in violation of R.C. 2905.01(A)(4). This offense is committed when by force, threat, or deception, a person removes the victim from the place where the victim is found or restrains the liberty of the victim "[t]o engage in sexual activity . . . with the victim against the victim's will." R.C. 2905.01(A)(4).

**{¶ 72}** "'Sexual activity' means sexual conduct or sexual contact, or both." R.C. 2907.01(C). "'Restraining an individual's liberty means limiting or restraining their freedom of movement.'" *State v. Turner*, 2024-Ohio-684, ¶ 53 (2d Dist.), quoting *State v. Williams*, 2017-Ohio-5598, ¶ 19 (10th Dist.). "Removing an individual from the place where he or she is found means changing the individual's location." *Id*., citing *Ohio Jury Instructions*, CR § 505.01(A) (Rev. Nov. 2023), and *State v. Sanders*, 2000 WL 377505, *3-4 (8th Dist. Apr. 13, 2000). "The removal 'need not be for any specific distance or duration of time or in any specific manner.'" *Id*.

29

{¶ 73} In this case, the evidence established that Humphreys had restrained H.B.'s freedom of movement when he charged at her, grabbed her shoulders, pushed her to the ground on her back, got on top of her, and tried to pin her down. The evidence also established that Humphreys had removed H.B. from where she was located on the bike path. H.B. testified that she and Humphreys had rolled into the grass and tumbled down into a wooded area. Therefore, although only one was required, both the removal and the restraining-liberty elements of kidnapping were established by the evidence.

{¶ 74} The evidence also established that Humphreys' removal and restraint of H.B. was for the purpose of engaging in sexual activity with her against her will. As previously discussed, the evidence established that Humphreys had indirectly indicated to H.B. that he wanted to have sex with her just before the attack. Significantly, the evidence established that while he was on top of H.B., Humphreys attempted to grab H.B.'s breasts and take off her pants. He also placed his pelvis on top of H.B.'s legs and attempted to rub his body up against her. This indicates, *at the very least*, that Humphreys removed H.B. from where she was located and restrained her freedom of movement with an intent to engage in forced sexual contact with her, i.e., to touch her erogenous zones. *See* R.C. 2907.01(B). Therefore, when viewing the evidence in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that the State had presented sufficient evidence of the elements of kidnapping in violation of R.C. 2905.01(A)(4).

{¶ 75} After reviewing the entire record and weighing all the evidence and reasonable inferences, we also find that the jury did not lose its way or create a manifest miscarriage of justice by finding Humphreys guilty of kidnapping. The weight of the evidence supports the jury's verdict on that offense. Humphreys conviction for kidnapping was not against the manifest weight of the evidence.

*Strangulation*

{¶ 76} Humphreys was also convicted of strangulation in violation of R.C. 2903.18(B)(2), which provides that, "[n]o person shall knowingly . . . [c]reate a substantial risk of serious physical harm to another by means of strangulation or suffocation." The phrase "'[s]trangulation or suffocation' means any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth." R.C. 2903.18(A)(1).

{¶ 77} Humphreys contends that the State failed to present evidence establishing that his act of strangling H.B. created a substantial risk of serious physical harm. A "[s]ubstantial risk" means "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Serious physical harm to persons" includes any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

31

{¶ 78} "The serious physical harm element can be reasonably inferred '[w]here injuries to the victim are serious enough to cause him or her to seek medical treatment.'" (Bracketed text in original.) *State v. Heald*, 2025-Ohio-3031, ¶ 41 (11th Dist.), quoting *State v. Wilson*, 2000 WL 1369868, *5 (8th Dist. Sept. 21, 2000); *State v. Sanabria*, 2019-Ohio-2869, ¶ 15 (11th Dist.), quoting *State v. Bowden*, 2014-Ohio-158, ¶ 33 (11th Dist.). "However, the exact level of harm required to establish serious physical harm 'is not an exact science.'" *Heald* at ¶ 41, quoting *State v. Irwin*, 2007-Ohio-4996, ¶ 37 (7th Dist.); *Sanabria* at ¶ 15, quoting *State v. Rogers*, 2018-Ohio-3495, ¶ 37 (2d Dist.).

{¶ 79} "In certain circumstances, bruising can constitute serious physical harm." *Heald* at ¶ 43, citing *State v. Worrell*, 2005-Ohio-1521, ¶ 18, 50 (10th Dist.), *rev'd on other grounds by In re Ohio Criminal Sentencing Statutes*, 2006-Ohio-2109, (finding sufficient evidence of serious physical harm constituting temporary serious disfigurement where victim sustained severe bruising on her lower back and hip that took six weeks to heal and for which the victim sought medical treatment and had to cover up while on vacation); *State v. Barbee*, 2004-Ohio-3126, ¶ 60 (8th Dist.) (finding sufficient evidence of serious physical harm where victim had been struck in the back of the head and suffered bruises on her neck that were approximately three to four inches in length and approximately two inches in width and were still visible four days after the attack); *State v. Burdine-Justice*, 125 Ohio App.3d 707, 714-715 (12th Dist. 1998) (finding sufficient evidence of serious physical harm where there was profuse moderate bruising across the victim's buttocks and back that was purple and red in color and somewhat raised and swollen); *State v. Krull*, 2003-Ohio-4611, ¶ 22 (12th Dist.) (finding sufficient evidence of serious physical harm where there was extensive bruising on the victim's buttocks and legs that was so severe the victim had to be taken to the emergency room for an examination).

**{¶ 80}** In *Heald*, the Eleventh District Court of Appeals found that the defendant's conviction for strangulation in violation of R.C. 2903.18(B)(2) was not against the manifest weight of the evidence and was supported by sufficient evidence where the evidence established that the defendant had used his arm to place the victim in a chokehold and strangled the victim while standing behind her, dragging her back, and pulling her up on her "tippy toes." *Heald* at ¶ 33, 39-51. The victim in *Heald* did not lose consciousness but testified that she was concerned that she could pass out. *Id*. at ¶ 48. The victim testified that her breathing was labored after she was strangled and that she was panting. *Id*. at ¶ 49. Red marks were observed on the side of the victim's neck after the incident, and the victim also had bruising on her arm that was caused by the strangulation. *Id*. The Eleventh District found that the bruising on the victim's arm "represents the greater harm [the victim] could have suffered from the strangulation and the substantial risk of serious physical harm that Appellant created by strangling the victim." *Id*.

**{¶ 81}** The present case is similar to *Heald*. H.B. testified that Humphreys had put his hand on her throat and choked her during the attack, which made it difficult for her to breathe. H.B. also testified that as a result of Humphreys choking her, she "had marks after the attack that were visible even the next day." Trial Tr. 164-165. H.B. further testified that she "was sore" and that her jaw, neck, and back "hurt for the following days." Trial Tr. 165. Photographs taken of H.B. the day after the attack show that H.B. had red marks on her hands and scrapes on her elbows, wrist, and back as a result of her struggling with Humphreys while he was strangling her. *See* State's Exs. 8, 14-17, and 21-22. H.B. also had a red mark on her neck from where Humphreys had his hand on her throat. State's Exs. 18-20. H.B. also testified that she had bruising on her neck from Humphreys choking her, although it is difficult to view the bruising in the picture.

33

{¶ 82} Based on the foregoing evidence, we find that Humphreys' act of strangling H.B. resulted in some temporary disfigurement in the form of scrapes, bruises, and red marks. We find that this evidence and the evidence establishing that the strangulation caused H.B. to suffer lasting pain in her jaw, neck, and back was sufficient for a rational trier of fact to conclude that Humphreys had created a *substantial risk* of serious physical harm to H.B.

{¶ 83} In reaching that decision, it is significant to note that the strangulation offense in question requires the offender to create a *substantial risk* of serious physical harm as opposed to actually causing serious physical harm. Again, "substantial risk" means that there is a strong possibility that a certain result may occur or that certain circumstances may exist. R.C. 2901.01(A)(8). The fact that Humphreys choked H.B. with such force that it left a red mark and bruising on her neck and resulted in H.B. suffering ongoing pain in her neck, jaw, and back for multiple days suggests that there was a strong possibility his actions could have caused H.B. serious physical harm as defined under R.C. 2901.01(A)(5). Also, similar to *Heald*, the injuries that H.B. sustained to her hands, elbows, wrist, and back while trying to fight off Humphreys as he was strangling her represent harm beyond the strangulation itself and reflect the substantial risk of serious physical harm that Humphreys had created by strangling her. *See Heald*, 2025-Ohio-3031 at ¶ 49 (11th Dist.).

{¶ 84} For the foregoing reasons, we reject Humphreys claim that the State failed to present sufficient evidence establishing that his strangulation of H.B. created a substantial risk of serious physical harm. When viewing the evidence in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that the elements of strangulation in violation of R.C. 2903.18(B)(2) were established at trial.

34

Therefore, Humphreys' claim that sufficient evidence did not support his strangulation conviction lacks merit.

{¶ 85} That said, "[t]he degree of harm that constitutes 'serious physical harm' is normally a matter of weight rather than sufficiency of the evidence. *Heald* at ¶ 41, citing *Sanabria*, 2019-Ohio-2869 at ¶ 15 (11th Dist.). However, Humphreys' claim that his conviction for strangulation was against the manifest weight of the evidence also lacks merit. After reviewing the entire record and weighing all the evidence and reasonable inferences, we cannot say that the jury lost its way or created a manifest miscarriage of justice by finding that Humphreys had created a substantial risk of serious physical harm to H.B. and that he was thus guilty of strangulation in violation of R.C. 2903.18(B)(2).

{¶ 86} Because Humphreys' convictions for attempted rape, kidnapping, and strangulation were all supported by sufficient evidence and were not against the manifest weight of the evidence, his second assignment of error is overruled.

**First Assignment of Error**

{¶ 87} Under his first assignment of error, Humphreys claims that the trial court committed reversible error by allowing the State to present evidence of his prior juvenile adjudication for attempted rape during his jury trial. Humphreys claims that the juvenile adjudication was inadmissible under Evid.R. 404(B). We agree.

*General Law on Other-Acts Evidence*

{¶ 88} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 2020-Ohio-4441, ¶ 36. But "[o]ther-acts evidence may be admissible for nonpropensity purposes—i.e., as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *State v. Worley*,

2021-Ohio-2207, ¶ 118, quoting Evid.R. 404(B). "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 2020-Ohio-4440, ¶ 22.

{¶ 89} "The Supreme Court of Ohio has put forth a three-step analysis for a trial court to use in determining the admissibility of other-acts evidence." *State v. Walter*, 2023-Ohio-2700, ¶ 62 (2d Dist.), citing *State v. Williams*, 2012-Ohio-5695, ¶ 20. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Williams* at ¶ 20, citing Evid.R. 401. With regard to this step, "[i]t is almost always true that propensity evidence will have some relevance. Indeed, such evidence is excluded 'not because it has no appreciable probative value but because it has too much.'" *Hartman* at ¶ 25, quoting 1A Wigmore, *Evidence*, § 58.2, at 1212 (Tillers Rev. 1983).

{¶ 90} The second step requires the trial court to determine "'whether the evidence is presented to prove a person's character to show conduct in conformity therewith or whether it is presented for a legitimate other purpose.'" *Walter* at ¶ 62, quoting *State v. Tench*, 2018-Ohio-5205, ¶ 139. Some legitimate, non-propensity purposes for presenting other-acts evidence include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27, citing *Huddleston v. United States*, 485 U.S. 681, 686 (1988). Other-acts evidence is improperly admitted if it is not relevant to any proper purpose for which it may be offered. *Id.* at ¶ 18, 73. "The determination of whether other-acts evidence

36

is admitted for a permissible purpose is a question of law, which we review de novo." *State v. Echols*, 2024-Ohio-5088, ¶ 30, citing *Hartman* at ¶ 22.

**{¶ 91}** "Finally, the last step is 'to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.'" *Walter* at ¶ 62, quoting *Williams* at ¶ 20. This "third step 'constitutes a judgment call which we review for abuse of discretion.'" *State v. McDaniel*, 2021-Ohio-724, ¶ 17 (1st Dist.), citing *Hartman*, 2020-Ohio-4440, at ¶ 22, 30; *Echols* at ¶ 39. However, if it is determined that the other-acts evidence constituted inadmissible propensity evidence, we need not reach the question of whether the trial court abused its discretion in otherwise admitting the evidence. *Hartman* at ¶ 64.

*Motive*

**{¶ 92}** Other-acts evidence may be properly admitted to prove motive. "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman* at ¶ 48. "[M]otive is that sense of need or desire that prompts a person to act." *State v. Schmidt*, 2022-Ohio-4138, ¶ 45 (12th Dist.), citing *Webster's Encyclopedia Edition Dictionary* (1987). This court has defined motive as "'a mental state which induces an act; the moving power which impels action for a definite result.'" *State v. Ratliff*, 2003-Ohio-6905, ¶ 20 (2d Dist.), quoting *State v. Smith*, 84 Ohio App.3d 647 (2d Dist. 1992). "For instance, 'if the state argues that a defendant committed murder to cover up an earlier crime, evidence of that earlier crime may be admitted to show the motive behind the murder.'" *Hartman* at ¶ 48, quoting *State v. Cobia*, 2015-Ohio-331, ¶ 19 (1st Dist.).

**{¶ 93}** "[O]ther acts demonstrating motive must be of a character so related to the offense for which the defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense." (Cleaned

37

up.) *State v. O'Connell*, 2020-Ohio-1369, ¶ 25 (1st Dist.). *See also Schmidt* at ¶ 43 ("[t]he other-acts evidence and the evidence of the charged offense must relate a logical connection which 'may reasonably disclose a motive or purpose for the commission of such offense'"), quoting *State v. Blankenburg*, 2012-Ohio-1289, ¶ 83 (12th Dist.); *State v. Dickerson*, 77 Ohio St. 34 (1907), syllabus ("[t]he commission of a prior crime may be shown for the purpose of furnishing a motive for the commission of the crime charged in the indictment, provided such prior crime is so related to the latter as to have a logical connection therewith and reasonably to disclose a motive for its commission"). The other act "'must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question.'" *Walter*, 2023-Ohio-2700 at ¶ 63 (2d Dist.), citing *State v. Snowden*, 49 Ohio App.2d 7, 10 (1st Dist. 1976), citing *State v. Burson*, 38 Ohio St.2d 157, 159 (1974).

### State v. Hartman

{¶ 94} *State v. Hartman*, 2020-Ohio-4440 is an instructive Evid.R. 404(B) Ohio Supreme Court opinion that both parties cite in their appellate briefs. In *Hartman*, the defendant was accused of raping an adult female acquaintance in her hotel room after they had spent the evening out with a group of friends. *Id*. at ¶ 1. To counter the defendant's claim that the sexual encounter was consensual, the State presented evidence establishing that the defendant had sexually abused his stepdaughter when she was a child. *Id*. at ¶ 12. Following trial, the defendant was found guilty of rape and appealed his conviction. *Id*. at ¶ 16. On appeal, the Eighth District Court of Appeals reversed the defendant's convictions on grounds that the evidence purporting to show that he had sexually abused his stepdaughter was inadmissible other-acts evidence under Evid.R. 404(B). *Id*. at ¶ 17. The Supreme Court of Ohio agreed with the Eighth District and held that the evidence at issue

"constituted improper propensity evidence, and the trial court erred in admitting it." *Id*. at ¶ 64.

{¶ 95} In its analysis, the Supreme Court concluded that the evidence concerning the molestation of the defendant's stepdaughter was not admissible to establish motive. *Id*. at ¶ 49. The court reasoned that the defendant's "molestation of his former stepdaughter [did] not reveal a specific reason for raping [the female acquaintance in the hotel room] and thus [did] not provide evidence of any motive to commit rape beyond that which can be inferred from the commission of any rape." *Id*., citing *State v. Curry*, 43 Ohio St.2d 66, 71 (1975) ("A person commits or attempts to commit statutory rape for the obvious motive of sexual gratification. Since motive cannot be deemed to have been a material issue at appellee's trial, 'other acts' testimony was not admissible to prove this matter."). The court explained that "in most cases of this type, there is no motive beyond that implicit in the commission of the offense itself." *Id*. at ¶ 50.

{¶ 96} In *Hartman*, the Supreme Court also considered whether the defendant's molestation of his stepdaughter was probative of intent. *Id*. at ¶ 58-63. With regard to intent, the court explained:

To determine whether other-acts evidence is genuinely probative of the intent of the accused to commit the charged crime, rather than merely the accused's propensity to commit similar crimes, the question is whether, "under the circumstances, the detailed facts of the charged and uncharged offenses strongly suggest that an innocent explanation is implausible." [Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, § 7.5.2. (2d Ed. 2019)]. Or to put it another way, the other-acts evidence "must be so related to the crime charged in time or circumstances that evidence of the other

acts is significantly useful in showing the defendant's intent in connection with the crime charged." [1 *Wharton's Criminal Evidence*, § 4:31 (15th Ed. 2019)]. *Hartman* at ¶ 58.

**{¶ 97}** The Supreme Court indicated that the defendant's molestation of his stepdaughter was not so closely related in nature, time, and place to the offense charged so as to be probative of intent. *Hartman*, 2020-Ohio-4440 at ¶ 62-63. The court stated:

Evidence that Hartman, while in his own residence, had molested his 12-year-old stepdaughter by touching her chest and vagina and placing her hand on his penis does not support an inference that Hartman entered E.W.'s hotel room with the intent to rape her while she was intoxicated. E.W. and B.T. are not in the same class of victims: one is an adult acquaintance, the other was a child relative. The acts Hartman allegedly forced E.W. to perform bear no similarities to the acts involving B.T. other than being sexual in nature. Without more, the fact that all the acts occurred at night in the victims' sleeping quarters does not provide the degree of similarity necessary to infer intent. The child-molestation evidence presented in this case simply was not probative of Hartman's intent with respect to the hotel-rape allegations.

*Hartman* at ¶ 62.

### 404(B) Analysis

**{¶ 98}** In this case, the trial court permitted the State to present evidence of Humphreys' prior juvenile adjudication for attempted rape for the limited purpose of establishing Humphreys' motive for attacking H.B. The State claims that this decision was proper because Humphreys had advanced a defense claiming that his attack on H.B. was not sexually motivated, but simply an assault, which made Humphreys' motive for attacking

40

H.B. a material issue. Therefore, the State claims that under Evid.R. 404(B)(2), it was permitted to introduce evidence of Humphreys' prior juvenile adjudication for attempted rape to establish his motive for attacking H.B.

{¶ 99} In support of its argument, the State claims that the Supreme Court of Ohio's decision in *Hartman* is distinguishable from the present case because in *Hartman* the court found that the defendant's motive for committing the rape in that case, i.e., sexual gratification, was not a material issue, but was implicit in the rape offense. While we agree that *Hartman* and the present case are different in that respect, that difference does not change the fact that the Supreme Court recognized in *Hartman* that the defendant's prior molestation of his stepdaughter was not probative of his reason for raping the female in the hotel room. Indeed, there was no logical connection between those two events so as to directly establish any motive or purpose of the defendant to commit the latter rape offense.

{¶ 100} This case similarly lacks a logical connection between Humphreys' prior juvenile adjudication for attempted rape and his attack on H.B. Essentially, the State's position is that Humphreys' prior juvenile adjudication for attempted rape—an offense that Humphreys committed against a different victim three years earlier[1]—was probative of his motive for physically attacking H.B. Boiled down, the State is arguing that Humphreys' previous adjudication suggests that his reason for physically attacking H.B. was to engage in forced sexual conduct with her. We, however, fail to see how a prior adjudication for an attempted rape that took place three years earlier against a different victim, without more, reveals Humphreys' specific reason for attacking H.B. The two incidents have no logical

---

1. Although the evidence established that Humphreys was adjudicated a juvenile delinquent for attempted rape in 2022, the case number associated with the adjudication indicates that the offense was charged in 2021, meaning that the attack on H.B. occurred approximately three years after the attempted rape for which Humphreys was adjudicated a juvenile delinquent.

41

connection or nexus other than the fact that they are both sexual offenses. The State essentially used Humphreys' juvenile adjudication to show that he had intended to engage in forced sexual conduct with H.B. because he had also tried to engage in forced sexual conduct with his prior victim, i.e., that he was acting in conformity with past adjudicated conduct. That is exactly the kind of propensity evidence that Evid.R. 404(B) prohibits. We conclude that the trial court erred by allowing the State to present Humphreys' prior juvenile adjudication for attempted rape as evidence of motive under Evid.R. 404(B).

{¶ 101} Although not specifically argued by the parties, we also find that Humphreys' prior juvenile adjudication for attempted rape is not probative of intent. We reach this conclusion because the details surrounding the juvenile adjudication were not presented at trial. The jury was presented with just the fact that Humphreys had been previously adjudicated for attempted rape in 2022. While advocating for the admission of the juvenile adjudication, the State advised the trial court that Humphreys had similarly attacked both victims by knocking them down and strangling them; however, those facts alone do not provide the necessary degree of similarity to infer intent. Had the State presented facts indicating that the prior juvenile adjudication arose when Humphreys similarly approached and attacked a female stranger after she rejected him, then such prior conduct could arguably be probative of intent. That, however, was not the case here.

{¶ 102} Further, we find that the other categories of permissible other-acts evidence—e.g., preparation or plan—do not apply to this case. Therefore, Humphreys' juvenile adjudication constituted improper propensity evidence that should not have been admitted at trial. Having reached this conclusion, it is unnecessary to determine whether the trial court abused its discretion in admitting the evidence.

**{¶ 103}** We note that the trial court's improper admission of the juvenile adjudication does not impact our sufficiency and manifest-weight-of-the-evidence determinations in the previous analysis of Humphreys' second assignment of error. "When evaluating an assignment of error challenging the sufficiency of the evidence, a reviewing court must consider all evidence admitted at trial, including the improperly admitted evidence that was the source of the reversal for trial error." *State v. Gideon*, 2020-Ohio-6961, ¶ 29, citing *State v. Brewer*, 2009-Ohio-593, ¶ 24-26. The same rule applies to assignments of error challenging the manifest weight of the evidence. *See State v. Keeton*, 2019-Ohio-2039, fn. 1 (2d Dist.) ("[a]s with a challenge to the legal sufficiency of the evidence, when considering a manifest-weight argument we may consider all of the evidence admitted at trial, regardless of whether it was admitted improperly"), citing *State v. Rich*, 2018-Ohio-1225, ¶ 16 (2d Dist.), citing *State v. Renner*, 2013-Ohio-5463, ¶ 20 (2d Dist.).

*Harmless Error Analysis*

**{¶ 104}** The Supreme Court of Ohio has explained that "the real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result. If not, the error may be disregarded as harmless error." *State v. Morris*, 2014-Ohio-5052, ¶ 25. "Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.'" *Id*. at ¶ 23, quoting Crim.R. 52(A). "Generally, an error is viewed as affecting a defendant's substantial rights only if the error was prejudicial." *State v. Rasheed*, 2024-Ohio-3424, ¶ 59 (2d Dist.), citing *State v. Harris*, 2015-Ohio-166, ¶ 36. "'Accordingly, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result.'" *Id*., quoting *Harris* at ¶ 36, citing *Morris* at ¶ 24-25.

{¶ 105} An appellate court must determine whether the admission of improper evidence at trial was harmless beyond a reasonable doubt. *Morris* at ¶ 28-29. "In determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at syllabus. "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." (Citations omitted.) *Id*. at ¶ 32.

{¶ 106} Upon review, we find that the evidence of Humphreys' prior juvenile adjudication for attempted rape undoubtedly impacted the jury's verdict on the attempted-rape count. Without the prior juvenile adjudication, which the trial court instructed the jury to use as evidence of Humphreys' motive for attacking H.B., there was minimal evidence establishing that Humphreys had intended to engage in sexual conduct with H.B. as opposed to sexual contact. The only other evidence suggesting that Humphreys intended to engage in sexual conduct with H.B. was her testimony that Humphreys had attempted to take off her pants and that she had *understood* Humphreys' offer to pay her money as indicating that he wanted sex. However, the record is clear that Humphreys never *explicitly* asked H.B. for sex.

{¶ 107} Under these circumstances, we cannot say that without the juvenile adjudication, there was *overwhelming* evidence establishing that Humphreys had intended to engage in forced sexual conduct with H.B. as opposed to sexual contact. Without overwhelming evidence of Humphreys' intent to engage in sexual conduct with H.B., we cannot find that the improper admission of the prior juvenile adjudication was harmless with

44

regard to the attempted rape count. Indeed, it is unclear whether the jury would have found Humphreys guilty of attempted rape without knowing about the prior juvenile adjudication.

{¶ 108} In contrast, the improper admission of the juvenile adjudication was harmless error with regard to the strangulation offense. Even without the juvenile adjudication, there was overwhelming evidence establishing that Humphreys had committed strangulation, as that offense does not inherently include any element of sexual motivation or intent. Therefore, the absence of the juvenile adjudication has no bearing on Humphreys' conviction for strangulation.

{¶ 109} We reach the same conclusion regarding Humphreys' kidnapping offense, notwithstanding its inclusion of an element regarding sexual intent. The sexual intent element of the kidnapping offense is broader than that of the attempted rape offense. To establish that Humphreys was guilty of kidnapping in violation of R.C. 2905.01(A)(4), the State had to show that Humphreys either removed H.B. from the place where she was found or restrained her liberty *for the purpose of engaging in sexual activity with her against her will*. The term "sexual activity" means sexual conduct, sexual contact, or both. R.C. 2907.01(C). Even without evidence of Humphreys' juvenile adjudication, there was overwhelming evidence establishing that he had intended to engage in sexual contact with H.B. Again, sexual contact means "any touching of an erogenous zone of another." R.C. 2907.01(B). H.B.'s testimony established that Humphreys had placed his pelvis on top of her legs and attempted to grab her breast, take off her pants, and rub his body up against her after she declined his offer to pay her money. The evidence overwhelmingly establishes that Humphreys removed and restrained H.B. to engage in sexual contact with her. Accordingly, we find beyond a reasonable doubt that the improper admission of the juvenile adjudication was harmless error as to the kidnapping offense.

{¶ 110} Humphreys' first assignment of error is sustained as to his attempted rape conviction and overruled as to his convictions for kidnapping and strangulation.

**Fifth Assignment of Error**

{¶ 111} Under his fifth assignment of error, Humphreys argues that the trial court erred by finding him to be an SVP and claims that the SVP specifications attached to his attempted rape and kidnapping offenses must be vacated. Humphreys asserts that the SVP specification attached to his attempted rape offense must be vacated because his conviction for that offense was improper due to it being obtained via the admission of other-acts evidence in violation of Evid.R. 404(B). Humphreys also claims that the SVP specification attached to his kidnapping offense must be vacated because: (1) the jury failed to return a statutorily required guilty verdict on the sexual motivation specification; (2) the evidence was insufficient to find him guilty of the SVP specification; (3) the trial court applied the wrong legal standard when making the SVP determination; and (4) the trial court relied on inadmissible hearsay during the SVP hearing.

*General Law on SVP Specifications*

{¶ 112} An SVP specification under Revised Code Chapter 2971 enhances the sentence of a person "who is convicted of or pleads guilty to a sexually violent offense and who also is convicted of or pleads guilty to a sexually violent predator specification that was included in the indictment . . . [or] a person who is convicted of or pleads guilty to a designated homicide, assault, or kidnapping offense and also is convicted of or pleads guilty to both a sexual motivation specification and a sexually violent predator specification that were included in the indictment." R.C. 2971.03(A). A "'[s]exually violent predator' means a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. § 2971.01(H)(1). "An

46

offender cannot be specified as a sexually violent predator ['SVP'] unless the SVP specification is charged in the indictment or count in the indictment." (Bracketed text in original.) *State v. Yoder*, 2011-Ohio-4975, ¶ 36 (5th Dist.), citing R.C. 2941.148.

*The SVP Specification on Attempted Rape*

**{¶ 113}** The parties do not dispute that Humphreys' indictment included an SVP specification to his attempted rape offense and that attempted rape is "violent sex offense" for which an SVP specification may be charged. *See* R.C. 2971.01(L)(3). However, because Humphreys' underlying conviction for attempted rape has been reversed as a result of the trial court's improper admission of his prior juvenile adjudication in violation of Evid.R. 404(B), the attached SVP specification must be reversed as well. *See State v. Sherrard*, 2003-Ohio-365, ¶ 31 (9th Dist.) ("[i]n order to be convicted of a sexually violent predator specification, a defendant must, among other things, be convicted of the underlying sexually violent offense"), citing R.C. 2971.01(H).

*Lack of Jury Verdict*

**{¶ 114}** Kidnapping is another offense for which an SVP specification may be charged so long as the indictment also charges the offender with a sexual motivation specification in relation to that offense. R.C. 2941.148. A sexual motivation specification is "a specification, as described in section 2941.147 of the Revised Code, that charges that a person charged with a designated homicide, assault, or kidnapping offense committed the offense with a sexual motivation." R.C. 2971.01(K). In this case, there is no dispute that Humphreys' indictment included a sexual motivation specification and an SVP specification on his kidnapping charge, as required by R.C. 2941.148. Humphreys, however, claims that the SVP specification to his kidnapping offense cannot stand because a jury verdict was not returned on the sexual motivation specification.

{¶ 115} R.C. 2971.02 sets forth the procedure trial courts must use to determine an SVP specification when a defendant is tried by a jury. The statute provides the following:

In any case in which a sexually violent predator specification is included in the indictment, count in the indictment, or information charging a violent sex offense or a designated homicide, assault, or kidnapping offense and in which the defendant is tried by a jury, the defendant may elect to have the court instead of the jury determine the sexually violent predator specification.

If the defendant does not elect to have the court determine the sexually violent predator specification, *the defendant shall be tried before the jury on the charge of the offense and, if the offense is a designated homicide, assault, or kidnapping offense, on the sexual motivation specification that is included in the indictment*, count in the indictment, or information charging the offense. *Following a verdict of guilty on the charge of the offense and, if the offense is a designated homicide, assault, or kidnapping offense, on the related sexual motivation specification*, the defendant shall be tried before the jury on the sexually violent predator specification.

If the defendant elects to have the court determine the sexually violent predator specification, *the defendant shall be tried before the jury on the charge of the offense and, if the offense is a designated homicide, assault, or kidnapping offense, on the sexual motivation specification that is included in the indictment,* count in the indictment, or information charging the offense. *Following a verdict of guilty on the charge of the offense and, if the offense if a designated homicide, assault, or*

48

***kidnapping offense, on the related sexual motivation specification***, the court shall conduct a proceeding at which it shall determine the sexually violent predator specification.

(Emphasis added.) R.C. 2971.02.

**{¶ 116}** The above emphasized language in R.C. 2971.02 indicates that a jury must return guilty verdicts on the designated homicide, assault, or kidnapping offense *and* the associated sexual motivation specification before either the jury or trial court determines the SVP specification. Accordingly, those guilty verdicts are necessary precursors to an SVP determination.

**{¶ 117}** In this case, Humphreys correctly asserts that there was no jury verdict returned on the sexual motivation specification attached to his kidnapping offense. The record establishes that the trial court did not provide a jury instruction or verdict form addressing that specification. At Humphreys' sentencing hearing, the State advised the trial court that the sexual motivation specification had not been determined with respect to the kidnapping charge and the trial court gave the following response:

> It's the Court's opinion that the way the [kidnapping] count was indicted . . . under section 2905.01(A)(4) which specifically has elements in it or one particular element that the purpose of restraining the victim was to engage in sexual activity. So I think just given the fact that the jury convicted the Defendant of that offense inherent in that section of the Ohio Revised Code, it appears to the Court has a sexual motivation so I would find the specification that the offense was committed with a sexual motivation.

Sentencing (Jan. 21, 2025) Tr. 4.

49

**{¶ 118}** Upon review, we find that the trial court erred by failing to follow the statutory procedure outlined in R.C. 2971.02. The statute required a jury verdict on the sexual motivation specification, not a finding from the trial court. The record, however, establishes that Humphreys invited the trial court's error. When the State advised the trial court that the sexual motivation specification had yet to be determined, it noted that the matter had been previously discussed and that the "[d]efense left it up to the Court to determine whether or not that kidnapping was done with sexual motivation." Sentencing (Jan. 21, 2025) Tr. 3-4. Humphreys' trial counsel did not disagree or object to this comment, nor did Humphreys' trial counsel object when the trial court made its finding on the sexual motivation specification.

**{¶ 119}** "Under the invited error doctrine, an appellant cannot attack a judgment for errors committed by himself or herself, for errors that the appellant induced the court to commit, or for errors into which the appellant either intentionally or unintentionally misled the court, and for which the appellant was responsible." *State v. Keeton*, 2023-Ohio-1230, ¶ 14 (2d Dist.), citing *State v. Minkner*, 2011-Ohio-3106, ¶ 24 (2d Dist.).

**{¶ 120}** By failing to object to the error, Humphreys waived all but plain error for review. "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice." *State v. Bailey*, 2022-Ohio-4407, ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under the plain-error doctrine, it must be established that "an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the [proceeding]." (Emphasis deleted.) *McAlpin*, 2022-Ohio-1567 at ¶ 66, quoting *Rogers*, 2015-Ohio-2459 at ¶ 22. "But even if an accused shows that the trial court committed plain error affecting the outcome of the

50

proceeding, an appellate court is not required to correct it." *Rogers* at ¶ 23. The Supreme Court of Ohio has "'admonish[ed] courts to notice plain error "with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.""" (Emphasis and bracketed text in original.) *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *Long* at paragraph three of the syllabus.

{¶ 121} In this case, we cannot say that there is a reasonable probability that the error at issue, which was invited by Humphreys, affected the outcome of the SVP determination. When considering the evidence presented at trial, it is more than likely that a jury would have reached the same conclusion as the trial court, i.e., that Humphreys had committed the kidnapping offense with sexual motivation. Under the specific circumstances of this case, the error at issue did not create a manifest miscarriage of justice that warrants reversing the SVP specification on Humphreys' kidnapping offense.

*Sufficiency of Evidence and Legal Standard*

{¶ 122} Humphreys claims that sufficient evidence did not support the trial court's judgment finding him guilty of the SVP specification to his kidnapping offense and that the trial court failed to use the correct legal standard when making the SVP determination. According to Humphreys, the State had to prove that he was an SVP by clear and convincing evidence. We disagree with Humphreys' claims.

{¶ 123} "An appellate court reviews a challenge of the evidence to support a conviction of a sexually violent predator specification under the sufficiency and manifest weight standards used to review the predicate conviction." (Citation omitted.) *State v. T.E.H.*, 2017-Ohio-4140, ¶ 70 (10th Dist.). Because Humphreys' argument is constrained to whether the State introduced sufficient evidence to prove that he is an SVP under R.C. 2971.01(H), we likewise constrain our analysis to reviewing the sufficiency of the evidence.

51

{¶ 124} When reviewing the sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus. Therefore, "[t]he standard of proof employed in determining whether an offender is guilty of a sexually violent predator specification is beyond a reasonable doubt." *State v. Jones*, 93 Ohio St.3d 391, fn.3 (2001), citing *State v. Williams*, 88 Ohio St.3d 513, 531-532 (2000). Accordingly, Humphreys is incorrect that a clear-and-convincing standard applies to SVP determinations.

{¶ 125} A "'[s]exually violent predator' means a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). From that definition, "Ohio courts have concluded that there are three elements or 'factors' that 'must exist before a defendant may be labeled as a sexually violent predator: (1) the offense occurred on or after January 1, 1997; (2) the defendant commits a sexually violent offense; and (3) it is likely that the defendant will engage in at least one more sexually violent offense in the future.'" *State v. Wardlaw*, 2025-Ohio-2221, ¶ 85 (8th Dist.), quoting *State v. Belle*, 2019-Ohio-787, ¶ 34 (8th Dist.).

{¶ 126} "'[T]he key inquiry for finding a defendant to be a sexually violent predator is whether the person is likely to engage in sexually violent offenses in the future.'" *Id*. Pursuant to R.C. 2971.01(H)(2), any of the following factors may be considered as evidence that tends to indicate that likelihood:

(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. . .

52

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

R.C. 2971.01(H)(2).

{¶ 127} The State is not required to produce evidence on all the foregoing factors to sustain its burden of proof. R.C. 2971.01(H)(2) (stating that "any of the following factors may be considered"). "Evidence sufficient to support even one of the factors listed in R.C. 2971.01(H)(2) is enough to affirm the trial court's finding that a defendant is a sexually violent predator pursuant to R.C. 2971.01(H)(1)." *T.E.H.*, 2017-Ohio-4140, at ¶ 72 (10th Dist.), citing *State v. Cartwright*, 2013-Ohio-2156, ¶ 27 (12th Dist.).

{¶ 128} In this case, the evidence established that Humphreys committed a sexually violent offense on or after January 1, 1997, when he kidnapped H.B. with a sexual motivation. *See* R.C. 2971.01(G)(2). We note that because an offender is only required to "commit" a sexually violent offense within the specified time frame, a "person need not have already been convicted of a sexually violent offense at the time of indictment to be indicted for and subsequently found guilty of a sexually violent predator specification." *State v. Hardges*, 2008-Ohio-5567, ¶ 50 (9th Dist.). Therefore, the current definition of "sexually

53

violent predator" allows "the underlying conduct in an indictment to satisfy the specification without a prior conviction." *State v. Townsend*, 2020-Ohio-5586, ¶ 12.

{¶ 129} The evidence also sufficiently established that it is likely that Humphreys will engage in at least one more sexually violent offense in the future. When analyzing that element, the trial court focused primarily on the factors (b) and (f) of R.C. 2971.01(H)(2). With regard to section (b), the trial court found that Humphreys "had a documented history from childhood into the juvenile developmental years that exhibits sexually deviant behavior, that being the prior adjudication for attempted rape." Hearing (Jan. 13, 2025) Tr. 25.

{¶ 130} We note that in contrast to the trial on Humphreys' underlying offenses, in the context of the trial court's determination of his SVP specification, his prior juvenile adjudication was properly admissible because the statutory framework of Chapter 2971 permits a broader admission of evidence than traditional criminal trials. *See, e.g.*, *State v. Maranger*, 2018-Ohio-1425, ¶ 35 (2d Dist.) (finding that evidence of sexually violent offenses committed against the victim and other minors in Wisconsin by the defendant at his residence was "clearly relevant to his conviction for the sexually violent predator specifications with which he was charged in Ohio").

{¶ 131} It also worth noting that the Supreme Court of Ohio's decision in *State v. Hand*, 2016-Ohio-5504—which held that it is unconstitutional to use a juvenile adjudication as the equivalent of an adult conviction to enhance a penalty for a later crime because a juvenile adjudication does not involve the right to a trial by jury—does not apply here. In *Hand*, the court struck down R.C. 2901.08(A), a statute which specifically provided that a prior "adjudication as a delinquent child or as a juvenile traffic offender is a conviction for a violation of the law or ordinance for purposes of determining the offense with which the person should be charged and, if the person is convicted of or pleads guilty to an offense,

the sentence to be imposed." *Hand* at paragraph one of the syllabus and ¶ 9. In doing so, the Supreme Court of Ohio made it clear that "a juvenile adjudication is not a conviction of a crime and should not be treated as one." *Id*. at ¶ 38.

{¶ 132} Unlike the statute in *Hand*, the relevant statutory scheme for SVP sentencing enhancement does not treat Humphreys' prior juvenile adjudication as a conviction of a crime. Rather, R.C. 2907.01(H)(2) provides that "a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior" is one of many factors that the trial court may consider when determining whether the offender is likely to engage in sexually violent offenses in the future. Therefore, a prior juvenile adjudication exhibiting sexually deviant behavior, such as the one in this case, is just a single factor that a court may consider when determining the likely-to-commit-future-offenses element of the SVP specification. Because this risk assessment is just one element of the SVP determination, evidence of a prior juvenile adjudication cannot by itself result in an SVP sentencing enhancement. To prove the SVP specification, other factors must be considered under the likely-to-commit-future-offenses element, and the other elements of the specification must be proven.

{¶ 133} This court reached a similar conclusion with regard to the inclusion of a prior juvenile adjudication as an alternative element of the offense of having weapons while under disability in violation of R.C. 2923.13(A)(2), stating:

Unlike the statute that was struck down in *Hand*, the statute at issue, R.C. 2923.13(A)(2), does not treat a prior juvenile adjudication as a conviction. Rather, a prior juvenile adjudication and conviction are treated as alternative elements necessary to establish the offense of having weapons while under disability. *Hand* does not ban the use of a prior juvenile adjudication as an

55

element of an offense; rather, *Hand* bans the use of a juvenile adjudication to enhance a penalty by treating the adjudication as an adult conviction. *Hand* at ¶ 37 (holding "it is fundamentally unfair to treat a juvenile adjudication as a previous conviction that enhances either the degree of or the sentence for a subsequent offense committed as an adult").

*State v. McComb*, 2017-Ohio-4010 (2d Dist.) at ¶ 26; *accord State v. Gause*, 2018-Ohio-313, ¶ 9 (2d Dist.).

**{¶ 134}** In addition to properly considering Humphreys' prior juvenile adjudication for attempted rape, under section (f) of R.C. 2971.01(H)(2), the trial court found it relevant that Humphreys' attack on H.B. was "particularly violent." Hearing (Jan. 13, 2025) Tr. 26. The trial court noted that H.B. had testified that "she was thrown to the ground" by Humphreys, that Humphreys "was on top of her holding her down," and that "she had to fight to escape." *Id*. The trial court also considered that Humphreys had punched H.B. in the face. The trial court further found that Humphreys' act of strangling H.B. placed her life in danger and made the attack more violent.

**{¶ 135}** Lastly, the trial court found it relevant that Humphreys' prior juvenile adjudication for attempted rape had occurred "only 2 to 3 years prior to the offense he committed in this case." Hearing (Jan. 13, 2025) Tr. 27. The trial court noted that it was "alarming" that Humphreys had "reoffended so quickly." *Id*.

**{¶ 136}** When considering the foregoing evidence in a light most favorable to the State, we find that there was sufficient evidence for the trial court to conclude beyond a reasonable doubt that Humphreys had committed a sexually violent offense on or after January 1, 1997, and that he was likely to engage in one or more sexually violent offenses

56

in the future so as to allow the court to find him guilty of the SVP specification attached to his kidnapping offense.

*Inadmissible Hearsay*

**{¶ 137}** Humphreys also claims that the trial court erred by allowing the State to present hearsay evidence during his SVP hearing under the public records exception to the hearsay rule. We disagree.

**{¶ 138}** The general rule is that hearsay statements are inadmissible as evidence. Evid.R. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). There are several exceptions to the hearsay rule, including the "Public Records and Reports" exception under Evid.R. 803(8). Pursuant to Evid.R. 803(8), the hearsay rule does not apply to "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report."

**{¶ 139}** We review a trial court's application of a hearsay exception for an abuse of discretion. *State v. Dever*, 64 Ohio St.3d 401, 410 (1992); *State v. Patton*, 2022-Ohio-3350, ¶ 16 (2d Dist.), citing *State v. Muttart*, 2007-Ohio-5267, ¶ 56 (applying abuse of discretion standard in finding that child's hearsay statements were admissible under a hearsay exception). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34.

**{¶ 140}** In this case, the State presented testimony from Detective Fent at the SVP hearing. Fent's testimony indicated that she had received a "CODIS hit" on Humphreys

57

based on the DNA evidence obtained from H.B.'s rape kit, i.e., the fingernail scrapings.[2]

Hearing (Jan. 13, 2025) Tr. 6. Fent explained that she had been able to obtain information

on Humphreys from Ohio's electronic sex-offender registration and notification database,

eSORN, which is a public database that law enforcement uses to register sexually oriented

offenders.[3] Fent indicated that she had obtained documentation from eSORN that included

information regarding the complaint, disposition, and the age of the victim in the juvenile

case for which Humphreys was registered a sexual offender.

{¶ 141} During Humphreys' trial on the underlying charges, Fent testified regarding

the documentation she obtained. The record indicates that Fent acquired a Shelby County

Juvenile Court document captioned "Judgment Entry Orders on Pre-Trial Conference,"

which included the February 23, 2022 order adjudicating Humphreys a juvenile delinquent

for attempted rape. Trial Tr. 277-278; State's Ex. 38. At the SVP hearing, Fent stated that

she had contacted the deputy in charge of the sexually oriented offender registry in Shelby

County and asked if the deputy was familiar with Humphreys. Fent said that the deputy

provided her with a history of Humphreys' prior juvenile case. From that, Fent learned that

---

2. CODIS stands for "Combined DNA Index System." It "is a computerized program designed to house DNA profiles from convicted offenders." *State v. Emerson*, 2012-Ohio-5047, ¶ 3, citing Ohio Bureau of Criminal Investigation, *CODIS Methods Manual*, Section 1 (2009).

3 . R.C. 2950.081(A) provides, in relevant part, that "[a]ny statements, information, photographs, fingerprints, or materials that are required to be provided, and that are provided, by an offender or delinquent child pursuant to sections 2950.04, 2950.041, 2950.05, and 2950.06 of the Revised Code and that are in the possession of a county sheriff are public records open to public inspection under section 149.43 of the Revised Code and shall be included in the internet sex offender and child-victim offender database established and maintained under section 2950.13 of the Revised Code to the extent provided in that section."

58

Humphreys had committed the prior attempted rape offense when he was 15 years old and that he committed the offense against his 13-year-old sister.

{¶ 142} Humphreys claims that Fent's testimony regarding the juvenile adjudication is inadmissible hearsay and that no documentary evidence was ever submitted to establish that there was a final adjudicatory order. We disagree. Because eSORN is a matter of public record, and because Fent testified that she had used eSORN to determine that Humphreys was a registered sex offender and to obtain documentation related to his prior juvenile adjudication, we find that her testimony falls squarely under the public records exception to the hearsay rule. Although the juvenile court order admitted into evidence did not include the final disposition of Humphreys' juvenile case, it did specifically indicate that the court had adjudicated Humphreys a juvenile delinquent for attempted rape. There is no evidence indicating that the adjudication was ever dismissed. Furthermore, Fent's testimony indicating that Humphreys was a publicly registered sex offender at the time of her investigation supports the conclusion that the adjudication was not dismissed.

{¶ 143} Although it is unclear from the record whether Fent's testimony regarding the victim's relationship to Humphreys was part of the eSORN information, even if that information was inadmissible hearsay, its admission would be harmless error because the trial court did not base its SVP determination on any specific detail of Humphreys' juvenile adjudication other than its date. Instead, when making the SVP determination, the trial court considered the violent nature of Humphreys attack on H.B. and the simple fact that Humphreys had a prior juvenile adjudication for attempted rape just two or three years earlier. Because Fent's testimony indicates that the information about the juvenile adjudication was matter of public record, we find that the trial court's decision to admit that

59

evidence under the public records hearsay exception was not an abuse of discretion. Accordingly, Humphreys' hearsay argument is not well taken.

{¶ 144} Humphreys' fifth assignment of error is sustained as to the SVP specification attached to his attempted rape conviction and overruled as to the SVP specification attached to his kidnapping conviction.

### Fourth Assignment of Error

{¶ 145} Under his fourth assignment of error, Humphreys claims that the trial court erred by failing to merge his convictions for attempted rape and kidnapping during his sentencing hearing, as he claims those offenses are allied offenses of similar import. Given that Humphreys' attempted rape conviction has been reversed and remanded for retrial based on the improperly admission of other-acts evidence in violation of Evid.R. 404(B), a determination on the merger issue is no longer live and therefore is moot. *Gideon*, 2020-Ohio-6961, at ¶ 26 ("an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court").

{¶ 146} Humphreys' fourth assignment of error is overruled as moot.

### Seventh Assignment of Error

{¶ 147} Under his seventh assignment of error, Humphreys claims that his convictions should be set aside based on the doctrine of cumulative error. "Under the doctrine of cumulative error, a conviction will be reversed where the cumulative effect of trial court errors deprives a defendant of the constitutional right to a fair trial, even though each instance of error, by itself, does not constitute cause for reversal." *State v. Wells*, 2022-Ohio-30, ¶ 28 (2d Dist.), citing *State v. York,* 2018-Ohio-612, ¶ 29 (2d Dist.). "The doctrine, however, does not apply unless there are 'multiple instances of harmless error.'" *Id.*, quoting *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

{¶ 148} During our review, we found three errors committed by the trial court. The first error was the improper admission of the juvenile adjudication during Humphreys' jury trial. The second error was the trial court's failure to charge the jury with the sexual motivation specification attached to Humphreys' kidnapping offense. The third error was the trial court *possibly* letting in inadmissible hearsay testimony regarding Humphreys' relationship to his juvenile-offense victim during the SVP hearing.

{¶ 149} The second error—the trial court's failure to charge the jury with the sexual motivation specification—was invited error that Humphreys waived for appeal. As previously discussed, it did not amount to plain error. It is well established that the cumulative error doctrine does not apply to "unobjected-to errors" that fail to meet the plain error standard. *State v. Alford*, 2024-Ohio-4637, ¶ 86 (5th Dist.), quoting *McAlpin*, 2022-Ohio-1567 at ¶ 259, citing *State v. Hill*, 75 Ohio St.3d 195, 212 (1996). Accordingly, it would be inappropriate to consider this error in the cumulative error analysis.

{¶ 150} As for the effect of the remaining errors, the first error—the improper admission of the juvenile adjudication—constituted reversible error as to the attempted rape conviction and harmless error as to the kidnapping and strangulation convictions. The third error—the *possible* admission of inadmissible hearsay during the SVP hearing—was harmless error. Upon review, we cannot say that the cumulative effect of the harmless errors in this case deprived Humphreys of a fair trial. *See State v. Jennings*, 2001 WL 1045490, *9 (10th Dist. Sept. 13, 2001) ("While it is true in certain unique cases that multiple harmless errors, when considered together, may violate a defendant's right to a fair trial, this is not one of those cases"). *See also State v. Chinn*, 2000 WL 1458784, *9 (2d Dist. Aug. 21, 1998) (finding that the doctrine of cumulative error was inapplicable where we found one instance of harmless error and reversed and remanded based on the remaining two errors).

**{¶ 151}** Humphreys' seventh assignment of error is overruled.

## Conclusion

**{¶ 152}** Having overruled Humphreys' second, third, fourth, sixth, and seventh assignments of error, and having overruled in part and sustained in part Humphreys' first and fifth assignments of error, his conviction for kidnapping with a sexual motivation specification and an SVP specification and conviction for strangulation are affirmed, and his conviction for attempted rape with an SVP specification is reversed and remanded to the trial court for a new trial.

. . . . . . . . . . . .

EPLEY, J., and HUFFMAN, J., concur.